In the Matter of the Judicial Settlement of the Account of Proceedings of NETTIE M. BLACK, as Executrix, etc., of ROBERT J. BLACK, Deceased.

NETTIE M. BLACK, as Executrix, etc., of ROBERT J. BLACK, Deceased, Appellant; MAY CLARK, Objector, Respondent.

Third Department, June 25, 1936.

*Robert G. Groves* [*W. N. Gill* and *H. H. Flemming* of counsel], for the appellant.

*Joseph Side* [*Joel L. Keater* of counsel], for the respondent.

HILL, P. J.   The executrix appeals from a decree surcharging her account with the amount which she had received for shares of stock sold and which she would receive from other shares which the decree directs her to sell in the open market, together with the dividends received thereon.   From this amount she is permitted to deduct the face of a promissory note of which she is the maker, held by the Kingston Trust Company, together with the interest due and which she had paid thereon.   The decedent was her husband.   He died November 1, 1929.   His will was executed January 28, 1928, when his estate was considerable because of inflated stock values.   He gave all to the appellant, his wife, except $10,000 to his cousin, the objector.   On October 2, 1929, the decedent caused to be transferred to his wife 826 shares of the common capital stock of five well-known corporations.   A portion was pledged to the Kingston Trust Company as collateral for his loan of $32,318.24. After the transfer, his note was canceled and one of like amount made by his wife substituted.   All of the stocks which she had received from her husband were made collateral security thereto. The surrogate has determined that the wife did not take title to the stocks, but held them as agent for her husband.

Appellant and testator were married in 1913.   Neither then possessed much property.   He owned a small house, incumbered by two mortgages; she had $700 in a bank.   With this he paid the second mortgage.   His earnings were deposited in a joint account. As their fortunes improved and a new house purchased, the deed was taken in their joint names.   Neither ever had a separate bank account.   His illness began in July, 1929, and following an operation for tonsils in August, he developed acute septicemia, the streptococci growing and circulating in the blood.

The evidence as to the transaction is given chiefly by the witness Davis, a near neighbor and close friend and an official of the Kingston Trust Company.   He says: " One night when I was there he told me he had decided to turn everything over to ' Net.'   That is Mrs. Black.   He even remarked at that time that ' she is the one that did it all anyway, she was entitled to it.' "   He says that the testator requested him to transfer the stock to Mrs. Black. " It was done orally first.   I said that we would have to have some authority in writing and asked Mrs. Black to send us a letter authorizing us to make the transfer.   A letter came to us.   I have a copy of it here.   A letter came to us, but it was signed by Mrs. Black,

so I asked one of the boys in the bank to take our regular receipt card up and have Mr. Black sign it himself, because she was the beneficiary under the letter and we wanted to get an actual receipt signed by Mr. Black he had received the securities back." The card signed by the testator was returned to the bank. The stocks were transferred on October second. It was then that his note was marked " canceled " and the new note, signed by the appellant, substituted. About two months before these conversations and transactions, Mr. Davis, because he observed that the testator was in failing health, and because of market conditions, suggested that the stocks held as collateral by the bank be sold and the note paid. The testator replied in substance that he did not wish to sell the stocks. A little later, again because of the condition of testator's health and the market, Davis advised that the stocks be turned over to Mrs. Black. " I told him she could handle the affairs at the bank better if in her name. * * * He said he didn't think he would do it right away. He said ' I will be able to take care of them, I will be out in a little while.' " The witness says that after that he had no more talks with the testator " because it made him nervous. I just forgot it." The next conversation in chronological order is the one which I first detailed.

Possibly it is not amiss to recall that the first rumblings of the financial storm that broke over this country and the world in late 1929 began in August of that year or earlier, and ominous portents of the coming storm had increased on October second, when this transfer was made. We are not permitted to construe these transactions in the light of what the testator would certainly desire if it were now given him to express a desire, and when his estate has shrunk to a small fraction of what he believed it to be at the time his will was made, or to consider that if this was not a gift, the specific legacy of $10,000 to the cousin will use the entire estate of the testator and the appellant will be disinherited. It may have some bearing that the decision in this case was made in February, 1933, with the decree not signed until three years later. During a portion of that time the amount of appellant's note exceeded the market value of all of the stocks she received, and respondent would have received nothing under the decision. The relevancy which that fact bears, if any, is the inferences which may be drawn from the conduct of the parties at the time the alleged gift was made. It seems improbable that Mrs. Black would have substituted her own note for that of her husband if she was acting only as his agent. By giving her note for more than $30,000, recourse for its collection, if the collateral was insufficient, could have been had to the house and property which stood in the joint names of her husband and

herself, and which by his death became hers absolutely. If the transfer was made to her only as agent to facilitate the transactions in the bank, she would have given the note as agent and not assumed individual liability.

To effectuate a gift there must be delivery by the donor and an acceptance by the donee. On this appeal there is no controversy as to delivery of possession and acceptance. No better evidence could exist of the acceptance of ownership by the appellant than the giving of her individual note to pay the loan on a part of the stocks. Also there must be an intent on the part of the donor to give as distinguished from the intent to establish some other relation. Testator's intent is the only issue on this appeal, if we are to consider only the question of a gift *inter vivos*. A gift may be inferred when, without explanation, a person has entirely divested himself of possession of and dominion over a thing. This inference is, of course, rebuttable. (*Beaver* v. *Beaver*, 117 N. Y. 421; *Matter of Van Alstyne*, 207 id. 298, 307.) Had the subject-matter of this gift been real estate and a deed delivered, proof that the delivery was conditional would have been inadmissible. A claim that the delivery of a deed was conditional and that it did not divest the grantor of ownership may not be made successfully. (*Herrmann* v. *Jorgenson*, 263 N. Y. 348; *Hamlin* v. *Hamlin*, 192 id. 164.) "Whether there is any sound basis for a distinction between cases relating to real estate and other kinds of written instruments, it is not now important to inquire, for the rule that instruments of the former character cannot be conditionally delivered to a party is too firmly established in this State to be overruled or even questioned." (*Blewitt* v. *Boorum*, 142 N. Y. 357, 363.) Recognizing the distinction, yet the unexplained delivery of personalty is significant upon the issue of the intent with which the delivery was made. If the testator only intended to make appellant his agent in connection with the handling of these stocks, he must have known that the giving of a power of attorney would have been sufficient, and his failure so to act indicates that he did not intend to make appellant his agent, and thus that the transfer effectuated a gift. (*Matter of Van Alstyne, supra,* p. 307.)

Assume for a moment that we are considering this as a gift *causa mortis* rather than *inter vivos,* and that testator expected the transfer would be effective only in the event of his death. It is only necessary that a gift be "made when the donor must be deemed to have had his death in view, as the possible result of an existing disorder. It is not necessary that the donor should have been *in extremis;* only, that his death, when it occurred, should be from the disorder which afflicted him and menaced his life. * * * The rule of

law, in such cases of gifts made in prospect of death, demands for their validity that the proof shall show the existence of a bodily disorder, or of an illness, which imperils the donor's life and which eventually terminates it." (*Williams* v. *Guile*, 117 N. Y. 343, 349.) The testator had been ill for months. His ailment had progressed steadily and at about the time of the transfer his attending physician required that he stay in bed and be attended by nurses. Blood transfusions were given frequently, and within about three weeks after this transfer the attending physician states it to be his opinion that the testator believed death was imminent. However, it is not necessary, in order to sustain the gift, to regard it as *causa mortis*, for the completed delivery and the transfer of possession and control, together with the testator's statement in substance that he had decided to turn everything over to his wife, that she was the one who was to be credited for the accumulation of the property and that she was entitled to it, sustain a gift *inter vivos*. Under all the circumstances proven, in view of the relations between the parties, no other conclusion is reasonable.

The decree of the surrogate should be reversed on the law and facts, with costs to both parties payable out of the estate. The findings made by the surrogate should be reversed, and this court should find that testator by the transfer of the stocks effected a valid gift thereof to his wife.

Rhodes, McNamee, Crapser and Bliss, JJ., concur.

Decree reversed on the law and facts, with costs to both parties payable out of the estate. The finding made by the surrogate that the transfer of stocks did not amount to a gift is reversed, and this court finds that the transfer of the stocks by the testator in his lifetime to his wife effected a valid gift thereof.