[Civ. No. 16990.   Second Dist., Div. One.   July 12, 1949.]

ETHEL BRODERICK, Appellant, v. GRACE KOEHLER, Individually and as Administratrix, etc., Respondent.

Geo. W. Rochester for Appellant.

J. Howard Corvin for Respondent.

WHITE, P. J.—At the time of the death of John Koehler on October 10, 1946, plaintiff and appellant, Ethel Broderick, was in possession of two cashier's checks issued by the Bank of America, dated August 5, 1946, and August 30, 1946, for the sums of $600 and $500 respectively, payable to the order of John Koehler, and not indorsed. Plaintiff brought an action to quiet title to the checks, basing her claim upon an asserted gift *causa mortis*. Trial before the court without a jury resulted in a judgment that plaintiff take nothing by her complaint; that the checks constituted property of the estate of John Koehler, deceased; and that plaintiff deliver the checks to the administratrix of said estate. From the judgment plaintiff has appealed.

It is urged that the evidence does not support the judgment and that the judgment is against the law. Both contentions are founded upon the premise that the trial court was bound to accept the assertedly uncontradicted and unimpeached testimony of plaintiff and her daughter whereby a prima facie case including every element of a gift *causa mortis* was allegedly established.

The plaintiff testified: "I had known John Koehler for about eight years before he died; he lived in an apartment house I managed. Mr. Koehler went to the hospital October 3, 1946, and my daughter and I went to visit him every two or three days. He was operated on October 7 and died October 10. On the Sunday before the operation, my daughter

and I went to see him at the hospital. He said he was not feeling good, in fact feeling worse. He asked me to get his trousers out of the closet and to hand him his wallet. He told me to take the checks out of the wallet and said, 'Those are yours, Mrs. Broderick, I want you to take and keep them, and in case anything happens to me, they are yours. . . . They are not indorsed but I am too weak to indorse them. The bank knows all about it.' "

Plaintiff's daughter testified to substantially the same effect.

An assistant cashier of the Bank of America testified that he had known John Koehler some five years prior to his death. He issued both the cashier's checks in question and had a conversation with Mr. Koehler in August about the checks. Mr. Koehler said he was having marital difficulties and did not want to keep money in his account. He said if anything happened to him he would like the money to go to Mrs. Broderick. The witness told him he couldn't do that with the cashier's checks, but should make a will. The witness knew Mrs. Broderick as a customer of the bank, and told her, after Mr. Koehler died, that he had said he wanted the money to go to her.

Grace Koehler, widow of decedent, testified that she obtained an interlocutory decree of divorce from Mr. Koehler in April, 1946, and had not seen him for a month to six weeks before his death and did not know he was in a hospital. Two days after the death Mrs. Koehler saw Mrs. Broderick in the apartment of a Mr. Lane. Mr. Lane gave Mrs. Koehler some of the papers of decedent. Thereafter Mrs. Koehler and Mrs. Broderick drove in Mrs. Koehler's automobile to a mortuary to arrange the funeral. On the way Mrs. Broderick gave Mrs. Koehler her husband's billfold. There was a small amount of money in it, and Mrs. Broderick said she had used some to pay a special nurse. "Mrs. Broderick offered me the two checks, but I was driving, I told her to take care of them until we got to the undertakers. After we got to the undertakers I didn't think of the checks and they were never mentioned any more that day. She didn't tell me about their having been a gift to her at that time. After we left the undertakers, we went to my apartment. There were friends of mine there so we had a coke and all talked. Then on the day Mr. Koehler was buried, I talked with Mrs. Broderick over the phone and we made arrangements to meet at the bank the next day and for Mrs. Broderick to introduce J. Howard Corvin (respondent's present attorney) to me. We met in Mr. Corvin's office and Mrs. Broderick introduced him to me.

I don't remember too much, but I think she mentioned the checks. I don't remember exactly what was said. After Mrs. Broderick told me about the checks, I don't remember just when I thought of them again. I don't think I thought of them driving from the mortuary with Mrs. Broderick, and while we sat around having a Coca-Cola. We never talked about the checks during our telephone conversation."

In rebuttal, Mrs. Broderick denied that the two checks were ever mentioned until the time she introduced Mrs. Koehler to Attorney Corvin, at which time she told Mrs. Koehler, "I have the checks that Mr. Koehler gave me." She further testified that on another occasion she said to Mrs. Koehler, "You know good and well Jack (Mr. Koehler) didn't want you to have them," to which Mrs. Koehler replied, "I know he didn't."

The trial court found that the cashier's checks were not "purchased as a gift causa mortis" to the plaintiff; that at all times the decedent "possessed the ability to indorse said checks had he desired to do so"; and further found that no gift *cause mortis* or any gift whatsoever was made.

At the conclusion of the trial, in rendering his decision, the trial judge said, in part:

"I am not at all satisfied that the decedent didn't have the ability to sign those checks. There was a witness to the conversation, who could have been obtained, who would have been an impartial witness to the conversation at that time. (This witness was a young man who shared decedent's room at the hospital.) There is no really competent testimony as to the condition of the decedent on the day that these checks were given. There is the testimony of the plaintiff that he was ill, but that is not the kind of testimony that proves the condition of a person. Now, there was a doctor here in this case, and he should have been able to testify as to the condition of the decedent, and I am not satisfied that the decedent intended to make a gift. I feel he could have signed those checks, and he certainly knew the checks had to be signed; . . . There is not a proper showing that this decedent was not able to sign those checks, and I think he was able to do that, and the proper way to pass the title to the property was by his executing the endorsement on those checks, and I feel there isn't sufficient evidence here of his inability to do so."

It is argued that nothing introduced by respondents tended in the slightest degree to rebut the evidence of appellant or even decrease its weight, and that such evidence established a

prima facie case; that the court was in error in basing his decision on the theory that the gift should have been witnessed by an unknown third party, that the showing as to the donor's illness was insufficient, and that the donor should have indorsed the checks. In effect, appellant's argument is that the evidence permitted of only one finding, that a gift was made.

In this argument appellant relies upon the statement in *Hynes* v. *White*, 47 Cal.App. 549 [190 P. 836], to the effect that "A court may not arbitrarily disregard the unimpeached evidence of a single witness." This contention finds an answer in the case of *Barham* v. *Khoury*, 78 Cal.App.2d 204 [177 P.2d 579], likewise involving an asserted gift *causa mortis*, where the court said (p. 215):

". . . While the court may not arbitrarily disregard the testimony of an unimpeached witness (*Hynes* v. *White*, 47 Cal.App. 549 [190 P. 836]), yet his testimony may be nullified by his manner, by his motives, by the content of his utterances, or by such behavior as may reasonably be deemed inconsistent with the truth. . . . The most positive testimony may be contradicted by inherent improbabilities or by circumstances that are inconsistent with its truth, and the manner of one's testifying may influence the court to disregard his positive testimony concerning a particular fact. . . ."

The circumstances surrounding the claim of a gift in the instant cause provided ample justification for the trial court's rejection thereof. Gifts *causa mortis* are not favored in law, and they should in all cases be established by clear and convincing proof of the requisites of such gift. (*Barham* v. *Khoury*, *supra*, p. 211; *Knight* v. *Tripp*, 121 Cal. 674, 678 [54 P. 267].) Evidence supporting such a claimed gift should be viewed with caution. (*Hart* v. *Olson*, 68 Cal.App. 2d 657 [157 P.2d 385].) The only testimony as to the actual delivery of the checks, the physical condition of decedent at the time of such delivery and the conversation had at that time was that of two interested witnesses, the plaintiff and her daughter. It appears from the record that the identity of the man occupying the other bed in the same hospital room with decedent could have been readily ascertained.

Obviously, mere delivery of cashier's checks without indorsement by the payee could not operate to pass title to the funds represented thereby, nor place it within the power of the donee to obtain possession of such funds. The plaintiff had nothing but the bare possession of two checks payable to the

decedent or his order. She attempted to explain his failure to indorse the checks by testimony that he said he was too weak to do so, but the doctor who was treating the decedent was not called as a witness. No explanation was offered for the failure to call either the doctor or the young man who shared decedent's hospital room. In connection with the asserted weakness of decedent, it might be noted that on direct examination the plaintiff testified that she handed him his trousers, that the decedent himself removed his wallet from the trousers, took out the checks and handed them to her. The daughter likewise testified that the decedent handed her mother the checks. On cross-examination plaintiff testified she was mistaken—that she herself, at decedent's direction, took the wallet from the trousers and removed the checks therefrom. In addition, there was conflicting testimony as to whether plaintiff on the day of the funeral had offered the checks to decedent's widow without asserting any claim to them.

When a finding is challenged upon the ground of insufficiency of the evidence to support it, the power of the appellate court begins and ends with a determination that there is or is not substantial evidence to support such finding. (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689].) When opposing inferences are reasonably deducible from the facts, the appellate court may not substitute its deductions for those of the trial court.

From the foregoing recital of the evidence, it is apparent that the trial court did not arbitrarily disregard the testimony of an unimpeached witness, but weighed the testimony in the light of the circumstances and evidence which were inconsistent with the claim that a gift was made or intended. These circumstances and evidence, considered with the unexplained failure to produce other evidence apparently within the power of the plaintiff to produce, were amply sufficient to support the findings.

The judgment is affirmed.

Doran, J., and Drapeau, J., concurred.