[Civ. No. 15686. Second Dist., Div. Two. Feb. 20, 1947.]

FRANK F. BARHAM et al., as Executors, etc., Plaintiffs and Respondents, v. N. N. KHOURY et al., Appellants; MARY SABA, Intervener and Respondent.

Paul Barksdale D'Orr and Frank H. Love for Appellants.

A. G. Ritter for Plaintiffs and Respondents.

Newton Van Why for Intervener and Respondent.

MOORE, P. J.—The question for decision is whether the court below was required to find the facts as given in the uncontradicted testimony of appellant, Khoury, or did it act in a lawful exercise of the judicial function in inferring from the circumstances of the alleged gift and the history of that appellant's relationship to the donor that there was no gift in view of death.

Prior to her decease, July 1, 1945, and at all times subsequent to June, 1940, decedent Maggie George resided in her comfortable home in the city of Beverly Hills. Her husband having accumulated a competency departed this life prior to the events unfolded in this narrative. Only the aged mother, Mary Saba, intervener herein, remained to solace and comfort her widowed daughter whose body was ill and whose years were rushing to an untimely and pathetic close. During the same period she kept two or three servants and appellant Khoury, doctor of medicine. He testified that after he had practiced his profession at San Bernardino for about three months she induced him to live in her home, to serve her as physician and to help her with her business; that she promised

him a salary and a bequest of all of her property if he would stay as long as she lived. He moved in during July, 1940. For three months he served her under a written contract as chauffeur to perform such services as she might direct and to act as her companion and medical adviser. Later a second writing defined the terms of his employment until February, 1942, when mutual releases of all obligations between the parties were effected. During the succeeding years Doctor Khoury served her at salaries ranging from $400 to $600 monthly.

On July 25, 1945, respondents qualified as executors of Mrs. George's will of May 22, 1944, and in August filed this action in claim and delivery to recover jewels valued in excess of $30,000 which Khoury claims to have been given to him by decedent six days prior to her demise. From an adverse judgment Doctor Khoury brings this appeal. Inasmuch as the judgment does not materially affect Mr. Love, Doctor Khoury alone will be referred to as appellant. Mary Saba intervened, claiming specified articles of the jewelry. She was likewise successful. She will be referred to as intervener.

### APPELLANT'S PROOF

Inasmuch as the judgment is based upon inferences drawn in large measure from the testimony introduced on behalf of appellant a fair presentation of the issues necessitates the substantial reproduction of all of the testimony relating to the alleged gift. No one other than appellant was present on June 25, 1945, when, he says, decedent placed him in possession of certain diamonds to be his if she did not return from the hospital whither she was bound that day. Neither was any other person present on the two occasions in April of the same year when she delivered to him a manila envelope containing the stones. However, in August, 1943, Attorney Love advised and witnessed a presentation of the jewels to appellant. He had known decedent for more than three years. On August 24, 1943, while he visited her for the purpose of preparing her will, she told him of her promise to appellant in 1940 to leave him all of her property if he should remain with her to the end of her life. He drafted the will pursuant to her instructions and she executed it on August 27. Two days later he returned to assist her in the execution of a codicil. Mrs. George was very ill at the time. She told her attorney that she had suffered the worst spell of her life and was very

208

much alarmed about her condition; that Dr. Khoury and a consultant had agreed that she should be hospitalized; that she feared she had reached the end of her trail; "I know my condition better than anybody. Now, I told you the other day I think a lot of Doctor Khoury; I want him to have my jewels. . . . I have got those jewels here in the house. . . . What I am afraid of is I might die. . . . I don't want those worthless nieces and nephews of mine coming in, ransacking my house and running off with those jewels." After she had informed him of their presence in the highboy, of her fears that she might not survive the trip to the hospital and of the probable acts of her relatives in depriving Doctor Khoury of the jewels, Mr. Love advised her that "maybe you had better give them to him right now, if that is what you want." Answering her summons, appellant thereupon entered the room and was introduced to the witness who repeated the fears of Mrs. George and her desire that he have "certain jewels in this house. . . . I have told her how she can give them to you." Pursuant to directions of decedent, appellant took a brown manila envelope from the drawer of the highboy and laid it on her bed. Then, in the language suggested by the witness, she said, "If I don't come back from the hospital alive, I want you to have these jewels," and she placed the package in Doctor Khoury's hand. Appellant's testimony concerning the same event differs in no essential respect from that of Attorney Love.

Mrs. George entered the hospital August 29, 1943, only later to return to her home, when appellant gave back the jewelry which she locked again in the drawer. In 1945, she made three trips to the hospital. With reference to each of those occasions only appellant testified as to decedent's gift of the jewels. They were always in the same envelope in which appellant kept them during her sojourns at the hospital, and upon each of her returns home he restored to her the packet which she placed again in its accustomed drawer, or had him do so. Her statements to him on the days of her departure for the hospital, according to his testimony, are as follows: (1—early April) "Here, Doctor, I think it is going to be a one-way trip, and if I die, don't come back from the hospital alive, I want you to have this jewelry." (2—late April) "Here is the key to the chest, Doctor, I want you to have this jewelry." She said, "You take it now." (3—June 25) She told me that she didn't feel that she was going to come back, and

it was a one-way trip. She said, "Here is the key to the chest drawer, and if I die, I want you to have all this jewelry, if I don't come back from the hospital alive." On her last departure appellant took the key from her hand, removed the jewelry and a pair of binoculars from the top drawer, put the jewels in his pocket, the binoculars in a grip in his closet and returned the key to Mrs. George who, as she was about to enter the ambulance, asked him to retain the key for safe keeping.

## Appellant Applies the Law to His Testimony

With his testimony as to the gift of the jewels uncontradicted appellant invokes the statutes and the decisions of this state and authorities from many other jurisdictions in support of his proposition that a genuine *donatio causa mortis* was made to him June 25, 1945. Section 1149 of the Civil Code provides "a gift in view of death is one which is made in contemplation, fear, or peril of death, and with intent that it shall take effect only in case of the death of the giver." ▓ It is ubiquitously the law that the essential attributes of a gift *causa mortis* are the following: (1) It must be made with a view of the donor's death; (2) the donor must die of the ailment or peril which he feared at the time of the gift; (3) there must be a delivery; (4) there must be an acceptance by the donee. ▓ The intent with which the delivery is made is important. Unless the donor intends to divest himself completely of control and dominion over the property the gift is incomplete. ▓ The intention is a question of fact to be determined by the trial court from all the evidence. ▓ Delivery of the thing must be absolute, the donor retaining a revocable expectancy. The donor must not only part with possession of the property but must relinquish to the donee all dominion and control over it. ▓ However, delivery may be symbolic. Conferring upon the donee power to get the gift and hold it is sufficient. ▓ Also, it may be delivered to a third party for the donee, or given to a trustee to distribute as directed. ▓ A gift in view of death is not defeated by a testamentary writing of the donor. Such a gift is distinguished from a gift *inter vivos* in that in the case of the latter there is no defeasance whereas in the former the right of defeasance on the part of the donor is an essential element. (*Estate of Escolle,* 134 Cal.App. 473, 480 [25 P.2d 860]; *Larsen* v. *Van Dieken,* 34 Cal.App.2d 352, 364 [93 P.2d

563] ; *Mutual Benefit Life Insurance Co.* v. *Clark*, 81 Cal.App. 546, 551 [254 P. 306] ; *Donovan* v. *Hibernia Savings & Loan Society*, 90 Cal.App.489, 502 [265 P. 995] ; *Grymes* v. *Hone*, 49 N.Y. 17, 19 [10 Am.Rep. 313] ; *Reh* v. *Ertrachter*, 196 Mich. 210 [162 N.W. 978] ; *In re Hennessey's Estate*, 253 App.Div. 6 [300 N.Y.S. 766] ; *Johnson* v. *Colley*, 101 Va. 414 [44 S. E. 721, 99 Am.St.Rep. 884] ; *Smith* v. *Eshelman*, 235 Ala. 588 [180 So. 313].) ▮ Any language used by the donor attempting to provide expressly with reference to his death has no effect upon the validity of a gift *causa mortis*. Such language merely repeats the legal implication and emphasizes that a gift *causa mortis* was intended. (4 Page on Wills, § 1688, p. 796 ; *Grymes* v. *Hone, supra; Johnson* v. *Colley, supra.*) The execution of a writing does not enhance the validity of a gift *causa mortis*. Its only advantage is to contribute to certainty in the proofs. It is the actual delivery of the property which converts the unexecuted and revocable purpose into an executed and completed gift. (*Knight* v. *Tripp*, 121 Cal. 674, 679 [54 P. 267].)

▮ While a gift *causa mortis* is revocable while the donor lives, yet in order thus to alienate a possession the immediate surrender of all dominion and control over the property given is a *sine qua non*. ▮ And in the event such dominion and control is postponed until some future date, as for instance the death of the donor, it becomes an unexecuted and unenforceable promise to make a future gift. (*Mutual Benefit Life Insurance Co.* v. *Clark, supra.*) ▮ Failure to prove the donor's declaration that the gift is to be effective only in event of his death does not impair the gift. Such condition is implied. (*Donovan* v. *Hibernia Savings & Loan Society, supra; Grymes* v. *Hone, supra.*)

If the court herein had found that decedent made a gift of her jewels to appellant it would have sufficient support in appellant's testimony. His version of the transaction is that she made a complete delivery of the precious stones to him and placed them beyond her own dominion and control during the last five days of her life. According to his testimony and the authorities above cited the valuables became finally vested in appellant on the day of Mrs. George's death.

## FINDINGS HAVE SUFFICIENT SUPPORT

The court below did not adopt the testimony of appellant as the basis of its decision. Of course, where there is no rea-

sonable impeachment of a witness the court must of necessity base its findings upon his uncontradicted testimony. ▮ In attempting to establish a gift *causa mortis* the recipient is met on the threshold of the temple with the doctrine that such gifts are not regarded with favor. They contravene the general rules prescribed by statute for the testamentary disposition of property and for this reason they should be established by clear and convincing proof of the requisites of such a gift. (*Knight* v. *Tripp, supra.*)

▮ In appraising the testimony of appellant the court below was obliged in the execution of its judicial function to require him to establish that the gift was made. This arises from the confidential relationship which existed between the two. He was not only decedent's employee but he held the exalted station of both adviser and physician. He had entered her home as such employee in July, 1940. He was thereafter in constant association with her for five years preceding her demise. He was conscious of his entire possession of her confidence as demonstrated by her original employment of him and by her gift in 1943, as well as by keeping him in her home at a generous salary during the five years. Under the circumstances it was incumbent upon appellant to prove every element necessary to establish a gift "by clear and convincing evidence." (*Mutual Benefit Life Insurance Co.* v. *Clark, supra,* p. 550.)

▮ When a judgment is challenged on the ground of the insufficiency of the evidence to support the findings four principles govern the conduct of the reviewing court, namely: (1) When two inferences are reasonably deducible from the facts the appellate court is forbidden to substitute its deductions for those of the trial court; (2) all conflicts must be resolved in favor of respondent and all reasonable inferences must be indulged in favor of the findings; (3) the power of the appellate court begins and ends with its determination that there is or is not substantial evidence to support the finding. (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689]; *Federal Construction Co.* v. *Brady,* 122 Cal.App. 446, 447 [10 P.2d 130]); (4) evidence which may in the transcript appear relatively unsubstantial may have been "overwhelming in its persuasiveness" when recited in the presence of the court. (*Estate of Bristol, supra.*)

▮ From the foregoing it is inescapable that if from all the facts in evidence as well as from appellant's testimony

the trial court drew inferences and made deductions which are not unreasonable the judgment cannot be reversed merely because no witness took the stand to contradict appellant's narrative of the events of June 25, 1945. He encountered *in limine* the doctrine that the confidential relationship between himself and decedent imposed upon him the burden of proving the gift. He testified that when he was first invited to enter decedent's home he was promised not only a salary but also a legacy of her entire estate. Not only did decedent make no bequest in her last will of the jewels to him, but before he had served her two years he released her from obligation to bequeath him anything. Inferring her wishes from her testamentary declaration appellant had ceased to be the primary object of her bounty. By her will of August 27, 1943, she left to appellant the residue of her estate after making provision for the support of her mother. By her will of January 25, 1944, she bequeathed to him all of her jewelry, personal property and personal effects and nominated him as her executor. But, by her will of May 22, 1944, she gave him only $3,000, while she left her trucks and trucking business worth $50,000 to respondents and the residue to her mother. From the diminution of appellant's legacy from practically all of her estate by the will of January to practically nothing in the will of May, the court may with reason have inferred that decedent's intention was more likely expressed in her final testamentary declaration. The court may have concluded that her feeling of affection for, or her sense of obligation to, Doctor Khoury had undergone a genuine change after January, 1944, and that there was no change prior to her departure for the hospital on June 25, 1945. Since mention of her jewelry was made in the January will and omitted from the May will, the following were not unreasonable deductions: (1) That if in May, 1944, she wished appellant to have the jewels as she had in August, 1943, and in January, 1944, she would have so declared; (2) that the mention of appellant in the last will as legatee of only $3,000 indicated a radical change of heart and that he should not take the $30,000 worth of her estate; (3) that if in January, 1944, she wished Khoury to have all of her jewelry, her home and all her personal property and revoked that devise in May, she knew from former experiences that she could in June, 1945, append a codicil to vest him with ownership at her death. From the facts that the will is the customary and common device used

for transferring one's riches to strangers to the blood, and that at the moment of expressing her final testamentary wishes decedent had appellant in mind but did not bequeath him the jewelry, the court may reasonably have inferred that she had no desire in the last month of life to give the precious stones to him.

In view of the five years appellant lived upon decedent's largess it must have impressed the court that if she had entertained so liberal a fondness for him as to desire that he become possessor of $30,000 of her wealth in addition to the home and salary she had supplied him it would have been the natural thing, the irrepressible wish of her heart, to declare in her last will that she desired to bestow upon him her jewels as she had done in January, 1944. If she disliked her nieces and nephews, as he reports her to have declared, she knew that her will would transfer the diamonds to the legatee named, and that a safety deposit box would hold them until she might have passed over the Great Divide. The court was authorized by law in the exercise of the judicial function to weigh probabilities against positive testimony. This doctrine is applied with special force when the other party to a transaction has been silenced by the grim reaper and where the rights of such deceased are seriously affected. That Mrs. George was disposed to employ counsel to write her wills; that she may have employed counsel who persuaded her that transfers of her properties should go by devise rather than by gift to the end that she might more satisfactorily partition her estate and facilitate the increase or decrease in the amount passing to each beneficiary; that she might have receded from a desire entertained in 1943, to enrich appellant with her jewels because of the home she had afforded him and the liberal salary she paid him; that a failing woman like Mrs. George would not blast her estate by giving property of the value of $30,000 to a stranger while her ignorant, sick, helpless, Lebanese mother, 89 years old, whom the daughter cherished, must remain for an indefinite period "awaiting alike the inevitable hour,"—these are reasonable probabilities according to which decedent might have acted and against which the trial court balanced the testimony of appellant that she gave him the jewels.

Furthermore, it is not probable that the unfortunate lady could have passed over to the doctor a packet of precious

stones which included possessions of the mother of a value in excess of $3,000 without a mention of such ownership, while leaving the latter only support for life. The mother's title thereto was established by her testimony in the presence of the court. She had obtained them either "through my earnings during many years" or "Maggie, she give it to me." In either event the court properly weighed the probability if not the certainty that Maggie would not heartlessly have deprived her mother of her own wealth so unceremoniously as to instruct a stranger to take it from a drawer. And thus balancing probabilities against the testimony of appellant the court was not arbitrary in rejecting the latter.

Also, appellant's inconsistent behavior arose like a ghost in the night to confront him. Four days after the passing of decedent appellant filed his verified petition for special letters of administration of her estate in which he averred that the aggregate value of decedent's personal property would be $45,000. On the same day he filed his petition for probate of her January will. He alleged therein that her estate consisted of jewelry, furniture and miscellaneous property of an estimated value of $25,000. The court was not obliged to accept as true his statement that he did not tell his attorney that there was jewelry belonging to the estate or that he did not read his petition which declared the jewelry. He told no one of the gift from decedent prior to his notifying respondent Mitchell on July 27, although he was in the office of Attorney Ritter on July 17, and on other occasions prior to Mr. Mitchell's demand for the jewels on July 26, 1945. His excuse for not telling Messrs. Mitchell and Ritter of his gift from decedent was his fear that they "would beat him up." These facts were fairly to be considered by the court in appraising the sincerity of appellant, who had been licensed to practice his profession in Wisconsin and in Missouri prior to 1935, and in California in 1937, and may have induced the belief that appellant's testimony was created out of his desire unjustly to enrich himself with the valuables of his departed friend. Moreover, such circumstances as (1) his claiming a gift from one deceased upon his unsupported word, (2) his having the exclusive opportunity to gain possession of the property, (3) the evidently weakened mind and will of decedent, (4) appellant's long delay in disclosing his claim of a gift, (5) his telling no one until some weeks after her demise, (6) his failure in 1945 to have her declare her wishes

expressed in the presence of another or to request her to memorialize the gift by a writing, (7) his having lived largely upon her bounty for over five years, (8) his alleging in a petition for letters her ownership of expensive jewelry,—such circumstances and the inherent improbabilities of his testimony were reasonable grounds for the fact finder to discredit appellant, and his credibility was to be determined solely by that tribunal. (*Bohn* v. *Gruver*, 111 Cal.App. 386, 393 [295 P. 891].) ■■■ While the court may not arbitrarily disregard the testimony of an unimpeached witness (*Hynes* v. *White*, 47 Cal.App. 549 [190 P. 836]), yet his testimony may be nullified by his manner, by his motives, by the content of his utterances, or by such behavior as may reasonably be deemed inconsistent with the truth. (*Bohn* v. *Gruver, supra.*) The most positive testimony may be contradicted by inherent improbabilities or by circumstances that are inconsistent with its truth, and the manner of one's testifying may influence the court to disregard his positive testimony concerning a particular fact. (*Staples* v. *Hawthorne,* 208 Cal. 578, 584 [283 P. 67]; *Caldwell* v. *Weiner,* 203 Cal. 543, 546 [264 P. 1110].)

## As to Mrs. Saba

The foregoing will suffice to answer appellant's contentions as against Mrs. Saba. That unhappy soul testified on her own behalf and specified the jewels that belonged to her. Under the authorities cited the finding that the property belonged to intervener cannot be disturbed. (*Estate of Bristol, supra.*)

Judgment affirmed.

McComb, J., and Wilson, J., concurred.